Filed 5/12/14  P. v. Reddix CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SCHNIRE SOWN REDDIX,<br><br>    Defendant and Appellant. | B244917<br><br>(Los Angeles County<br>Super. Ct. No. YA081677) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven R. Van Sicklen, Judge.  Affirmed.

Kenner & Greenfield and David E. Kenner for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael C. Keller and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Schnire Sown Reddix appeals from a judgment of conviction entered after a jury found him guilty of attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1)[1] and assault with a firearm (§ 245, subd. (a)(2); count 3). The jury found Reddix not guilty of attempted robbery (§§ 211, 664; count 2). With respect to counts 1 and 3, the jury found true the allegations that Reddix personally and intentionally discharged a firearm and caused great bodily injury. (§ 12022.53, subds. (b), (c), (d).) In a bifurcated trial, the court found true the allegations that Reddix had served two prior prison terms for felonies within the meaning of section 667.5, subdivision (b). The court sentenced Reddix on count 1 to state prison for a term of 34 years to life, consisting of the middle term of seven years, plus two 1-year prior prison term enhancements, plus 25 years to life for the firearm-use enhancement. The trial court stayed the sentence on count 3 pursuant to section 654.

Reddix argues that the trial court erred by responding to a note from the jury without the parties or counsel present and by failing to instruct the jury sua sponte on the corroboration requirement for accomplice testimony. Reddix also argues that the prosecutor improperly impeached his alibi witnesses. We find no prejudicial error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *July 3, 2011*

On Sunday night, July 3, 2011 Rashid Green had dinner with his friend Teena Hines at Joe's Crab Shack. They were not romantically involved, although Green was interested in starting a relationship with Hines. To arrange the date, they exchanged text

---

[1]    Unless otherwise stated, all section references are to the Penal Code.

messages and phone calls.  After their evening together, Green sent Hines a text message the next day that read, "Just wanted to say hi.  Enjoy your day."

B.  *July 4, 2011*

Hines met Reddix in 2007 through his sisters, who were friends of hers.  Hines and Reddix had a romantic relationship in 2009, in which Reddix was jealous, threatening, and physically abusive.  They broke up and made up "quite a few times." Reddix and Hines argued about Reddix dating other women, and Hines said she wanted an exclusive relationship.  Hines eventually obtained a restraining order against Reddix in January 2011 after he continued to call her, show up at her work and her home unannounced, and abuse her.

On July 4, 2011 Reddix's family had a large annual party for the extended family and friends at Reddix's grandmother's house and at a park nearby.  The family always had a big celebration and family reunion on the Fourth of July that included a "big fireworks show."  Over 250 people attended during the course of the day.

Reddix's sisters invited Hines to attend the party.  Reddix arrived after Hines and was one of the people at the party responsible for the fireworks show.  Hines saw Reddix during the party and had a short conversation with him.  She had not spoken to him before that for over a month.  Although Hines was not paying attention to what Reddix was doing at the party, she did observe that several of Reddix's girlfriends and "baby mothers" were there, some of whom were her friends.  Reddix had "a number of his girlfriends at the party at the same time."

At approximately 10:00 p.m. Hines left the party and walked to her car, a Mercedes Benz ML500, which was parked a few houses down the street.  As she got into her car, Reddix appeared and approached her passenger side window, which was open about an inch, and said he needed to talk to her.  Hines saw that Reddix was standing on the sidewalk next to her car and had a gun.  Hines told Reddix that their relationship was over, she had to go to work in the morning, and she did not want to talk to him.  Reddix

3

became angry and got in the car, saying "I'm gonna shoot up your car," "You're going to die today," and "I'm sick of going through it with you." Hines began to cry.

Reddix asked Hines if she had been dating and having sex with other men. Reddix grabbed Hines' phone off the center console, "started going through all the recent calls and the text messages," and came across the calls and messages between Hines and Green the previous day.[2] When Reddix discovered that Green was the last man with whom Hines had communicated on her phone, Reddix said, "I'm going to call him, and you ask him for money."

C.      *July 5, 2011*

Early Tuesday morning on July 5, 2011, around 1:00 a.m., Green was in bed watching the news on television and getting ready to go to sleep. Green received a call from Hines on his cell phone asking if she could borrow $2,000. Green said he was willing to help her out, but he did not have $2,000. He offered to give her $100, but Hines talked him up to $250. Green had no idea why Hines wanted the money, but she was a good friend and he wanted to help her.[3] Green's romantic interest in Hines, not previously reciprocated, was "what got [him] out the bed at 1:00 in the morning." Green was a little excited and looked forward to seeing Hines, especially because it was unusual for her to call him at 1:00 in the morning. He did not know what might develop. Unbeknownst to Green, Reddix had used Hines' phone to call him, put the call on speakerphone, and then coached Hines in asking Green for money.

Green suggested that they meet at a 7-Eleven convenience store on the corner of Rosecrans and Vermont Avenues. Green had the money with him at home, so he "got

---

[2]      The People showed the text messages to the jury, and Hines confirmed that they were the text messages that Reddix saw when he took her phone.

[3]      By the time of trial, Green and Hines were no longer friends. Green explained, "Today? Let me see. I pretty much hate her now. No friendship at all. Pretty much hate her. Don't want anything to do with her. Mad I ever met her."

up, got dressed, and headed out." Hines drove to the 7-Eleven, while Reddix held the gun in his lap.

Hines later called Green and asked to change locations to the McDonald's restaurant on El Segundo Boulevard and Western Avenue. Green agreed, because Western Avenue was closer to his house, although according to Green it did not matter that much because his "car is fast" and he was "going to get there." Although Green did not know it, Reddix had changed the location of the meeting to El Segundo Boulevard and Western Avenue because there was police activity near the original location of Rosecrans and Vermont Avenues. Reddix, who still had the gun with him, told Hines that if she did not call Green and change the location, he would kill her. When Hines arrived at the McDonald's restaurant, Reddix told her where to back into a parking space.

Green arrived at the McDonald's restaurant parking lot a little after 2:00 a.m. Hines' car was already there, parked in the first parking space. Green parked in the third parking space, leaving an open space between their cars. Both Green and Hines had backed into the parking spaces, so that both cars were facing the McDonald's restaurant. Green did not see anyone near Hines' car. Reddix told Hines to get out of her car and get the money from Green. Reddix stayed in Hines' passenger seat, with the seat reclined and the window slightly open.

Hines and Green got out of their cars from the driver's side door and met in the empty parking space between their cars. Green had the money in his left hand and his phone in his right hand. They exchanged greetings and had a brief conversation about a burn mark on Green's face that he had suffered in a recent water heater accident. Green gave Hines the $250. Hines, who wanted to "get [Green] out of there," backed away and said, "Thank you, I'll talk to you. I'll call you later." Green realized that there was not going to be any romantic encounter with Hines that night, so he returned to his car.

Green was about to get in his car when he heard the door of Hines' car open behind him and a voice ask for more money, saying "Is that all you got?" Green looked over his shoulder, but before he could say anything Reddix shot him in the back of the shoulder, which caused him to spin around and fall to the ground. Hines, who was

5

walking back to her car, turned and saw Reddix standing outside of her car next to the open passenger door with a gun in his hand. Although Hines did not see Reddix shoot Green, she testified she was "a hundred percent sure" that he had. Hines thought that Reddix was going to kill her too.

Green felt the bullet enter his shoulder and knew he had been shot. He moaned. Green saw the gun, which was a large, blue steel "Tec 9 or Uzi kind of situation. It wasn't a handgun. It was something pretty big." Green said "it was definitively an Uzi, Mac 10, in that caliber, because it had . . . a lip, a barrel in the front of it, and it was a round face," with "the firing mechanism . . . on the top of the gun. Like I say, it wasn't a handgun, no."

After Green fell to the ground he "got the actual clear and best look at [Reddix's] face." Reddix was wearing a grey "hoodie" sweatshirt with the hood pulled up over his head "to the hairline." The light from the interior of Hines' car was "illuminating his face." Green had a good look at Reddix.[4] As Green was on the ground near Reddix, "looking up at [his] face," he saw Reddix "more or less playing with the gun," as if it were jammed. This gave Green an opportunity to flee. He got up and ran through the parking lot, took cover behind a doughnut stand, and then ran away to another shopping center. He still had his phone in his hand and called 911.[5] The police and fire department arrived and took him to the hospital.

Meanwhile, Reddix told Hines to get back into the car and drive to 134th Street and Central Avenue. Hines complied because she was "scared for [her] life." Reddix told Hines where to turn and how fast to drive, threatening her along the way. Much later that evening, Hines was able to escape from Reddix by going out a second story apartment window after he fell asleep. Hines went to a Sheriff's station, told the authorities what had occurred, and identified Reddix in a photographic lineup.

---

**4**      Green had just put fresh contact lenses in his eyes after the burn accident.

**5**      At trial, the People played the 911 recording for the jury.

D. *July 6-12, 2011*

Doctors treated Green at the hospital for six days. On July 6, 2011 a detective came to the hospital and Green told the detective what had happened and gave him a description of the person who had shot him. Green identified Reddix from a photographic lineup. Green identified Reddix in the lineup as "the guy I seen that shot me" and identified Reddix in court, saying he was "a hundred percent sure" Reddix was the person who shot him. Green testified at trial, "I could pick him out of a lineup. I could have picked him out that night, the next night, tonight, today. I mean, I never been shot before. . . . And someone actually shot me as I'm . . . trying to help someone . . . out. So yes, I got a good look at the person that — I couldn't believe actually shot me."

E. *Alibi Evidence*

At trial, Reddix called three alibi witnesses: his cousin, Antrawn Acklin, a friend, Paul Enoex, and another cousin, Cedric Hodges. The three of them testified that Reddix had stayed with them after the party until 1:30 or 1:45 a.m., cleaning up the inside and outside of the house. Enoex stated that Reddix was still at the house when he left at 2:00 a.m. Hodges said that he and Reddix fell asleep watching a movie in a converted garage where he and Reddix lived and that Reddix was there in the morning when he woke up. Acklin and Hodges were impeached with prior felony convictions, and all three witnesses were impeached with evidence that they failed to come forward with their alibi evidence before trial.

## DISCUSSION

A. *The Trial Court Did Not Violate Section 1138 by Refusing To Give the Jury a Copy of Section 12022.53*

In the information, the People alleged that Reddix personally used a handgun (§ 12022.53, subd. (b)), personally and intentionally discharged a handgun (*id.*, subd. (c)), and personally and intentionally discharged a handgun that caused great

7

bodily injury (*id*., subd. (d)). The trial court instructed the jury pursuant to CALCRIM No. 3146 that if it found Reddix guilty of assault with a firearm, then the jury would have to "decide whether the People have proved the additional allegation that the defendant personally used a firearm during the commission or attempted commission of that crime." The trial court also instructed the jury pursuant to CALCRIM No. 3150 that if it found Reddix guilty of attempted murder or attempted robbery, then the jury would have to "decide whether, for each crime, the People have proved the additional allegations that the defendant personally and intentionally discharged a firearm during that/those crimes and, if so, whether the defendant's act caused great bodily injury." For some reason, the top portions of the written jury instructions on these allegations contained references to section 12022.53, subdivisions (b) and (d), but not section 12022.53, subdivision (c). The verdict form included references to all three subdivisions. During deliberations the jury sent the court the following written question: "May we get a copy of Penal Code section 12022.53(c)." The trial court wrote the word "No" on the question form, initialed it, and wrote the date and time of the answer.

Reddix contends that the trial court committed error by answering this question without going on the record and in the absence of Reddix and his attorney. Reddix cites section 1138, which provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

Assuming that Reddix is factually correct that the trial court responded to the jury's request for a copy of section 12022.53, subdivision (c), without counsel, the jury, or a court reporter present, the trial court did not violate section 1138. Section 1138 applies, among other situations, when the jurors "desire to be informed on any point of law arising in the case." The jurors here did not express a desire to be informed on a

8

point of law. They had already been instructed on the point of law governing the firearm allegations and the jurors did not ask for any further instruction. They only asked for a copy of a statute in the Penal Code.

Moreover, a violation of section 1138 "'occurs only where the court actually provides the jury with instructions or evidence during deliberations without first consulting counsel.'" (*People v. Avila* (2006) 38 Cal.4th 491, 613; see *People v. Hawthorne* (1992) 4 Cal.4th 43, 70; *People v. Mickle* (1991) 54 Cal.3d 140, 174.) The trial court did not provide the jury with any instructions, evidence, or any other information. To the contrary, the trial court refused to provide the jurors with anything. The answer "no" was not information or evidence. There was no violation of section 1138.[6]

Finally, any error was not prejudicial. (See *People v. Robinson* (2005) 37 Cal.4th 592, 634 ["""[a] conviction will not be reversed for a violation of section 1138 unless prejudice is shown"""]; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1020 [applying harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836 to a section 1138 violation].) The trial court properly instructed the jury pursuant to CALCRIM No. 3150 on the allegation that Reddix personally and intentionally discharged a weapon. There was no reason for the trial court to give the jury a copy of section 12022.53, subdivision (c), and it is not reasonably probable that the court's refusal to do so had any effect on the verdict. (See *People v. Hawthorne*, *supra*, 4 Cal.4th at pp. 61-62, 69 [instructions given by the trial court to the jury through the bailiff in response to a jury question were not grounds for reversal where "the court did not direct the jury on any question 'regarding the law or the evidence'"].)

---

**6** The rule prohibiting communications between the trial court and the jury except in open court and with prior notice to counsel has constitutional dimensions because such ex parte communication may deprive the defendant of the constitutional right to counsel. (See *People v. Hawthorne*, *supra*, 4 Cal.4th at p. 69.) Reddix, however, does not argue that the trial court's refusal to provide the jury with a copy of section 12022.53, subdivision (c), violated his constitutional, as opposed to statutory, rights.

9

*People v. Dagnino* (1978) 80 Cal.App.3d 981, cited by Reddix, is distinguishable. In that case the trial court, without notifying counsel or having the defendant present, responded to two out of three questions from the jury by giving the jury copies of instructions the court had previously read to the jury. The instructions addressed the difference between first and second degree burglary, the definition of an accessory, and the definition of circumstantial evidence. (*Id.* at pp. 984, 989.) The court held that giving these instructions to the jury, "without the presence of counsel and absent a stipulation, comprise[d] both constitutional and statutory error" under section 1138. (*Id.* at pp. 986, 988.) The court found that these errors were prejudicial because "counsel should have had an opportunity to move the court to exercise its discretion in favor of reading the instructions" rather than just giving the jury copies of the instructions, and because counsel "might properly have asked for the reading, or the giving, to the jury" of other instructions. (*Id.* at p. 989.)

Here, unlike *Dagnino*, the jury did not ask for any instruction on the law; they only wanted a copy of a Penal Code statute. In response, the court did not give the jurors any instruction or provide any substantive response. As the Supreme Court stated in distinguishing *Dagnino*, in words equally applicable to this case: "In *Dagnino*, the Court of Appeal held that the trial court prejudicially erred when it provided to the deliberating jury, pursuant to its requests but without notification to counsel, additional instructions on the difference between first and second degree burglary and the definition of accessory and also a written copy of previously read instructions. ([*People v. Dagnino*, *supra*, 80 Cal.App.3d] at pp. 989-990.) In contrast, the jury in [this] case made no inquiry about the law or the facts of the case, and the court did not give any directions to the jury." (*People v. Avila*, *supra*, 38 Cal.4th at pp. 613-614.)

B.     *The Trial Court Did Not Err by Failing To Instruct Sua Sponte That Accomplice Testimony Must Be Corroborated*

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the

10

defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Reddix argues that Hines was an accomplice, or at least there was a factual issue for the jury about whether she was. Therefore, Reddix argues, the trial court "should then have given the instruction on accomplice testimony, which explains that accomplice testimony must be corroborated by independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged."[7]

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. [Citation.] This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. [Citations.]" (*People v. Houston* (2012) 54 Cal.4th

---

[7] Reddix cites to CALCRIM No. 335, which provides in part: "You may not convict the defendant of [the crimes] based on the testimony of an accomplice alone. You may use the testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crimes. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] The evidence needed to support the testimony of one accomplice cannot be provided by the statement or testimony of another accomplice. [¶] Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

11

1186, 1223.) "The cautionary instructions governing accomplice testimony have their roots in English common law. [Citations.] The reason most often cited in support of these instructions is that an accomplice is inherently untrustworthy because he or she 'usually testif[ies] in the hope of favor or the expectation of immunity.' [Citation.] In addition, an accomplice may try to shift blame to the defendant in an effort to minimize his or her own culpability. [Citation]." (*People v. Tobias* (2001) 25 Cal.4th 327, 331; see *In re Christopher B.* (2007) 156 Cal.App.4th 1557, 1561 ["[t]his cautionary rule has its roots in 'the fact that experience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity,'" and a "coperpetrator has a natural incentive to shift blame to the accused in hopes of minimizing his or her own culpability"].)

The trial court must give a sua sponte instruction on accomplice testimony corroboration "only where there is substantial evidence that the witness was an accomplice. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 466.) "'An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant' (§ 1111) and does not include an accessory [citations]. 'An accomplice must have "'guilty knowledge and intent with regard to the commission of the crime.'" [Citation.]' [Citation.]" (*Id.* at p. 467; see *People v. Houston*, *supra*, 54 Cal.4th at p. 1224.) A mere accessory is not an accomplice. (*People v. Lewis* (2001) 26 Cal.4th 334, 369.) The defendant has the burden of proving that a witness was an accomplice by a preponderance of the evidence. (*People v. Cook* (2006) 39 Cal.4th 566, 601; *People v. Tewksbury* (1976) 15 Cal.3d 953, 958.)

Here, any error in not giving accomplice instructions was harmless because Hines' testimony was corroborated by Green's testimony. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303-304 ["even in cases where the full complement of accomplice instructions . . . was erroneously omitted, we have found that sufficient corroborating evidence of the accomplice testimony rendered the omission harmless"]; *People v. Cook*, *supra*, 39 Cal.4th at p. 601 [failure to give accomplice instructions "is harmless, even if

12

erroneous, when there is 'ample evidence corroborating the witness' testimony'"].) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 147-148.) The corroborating testimony from Green was much more than that. Green had a good look at Reddix and the gun and was easily and with certainty able to identify Reddix immediately after the shooting and at trial. Reddix acknowledges that Green said he "was 'sure' of the identification he made" of Reddix as the shooter. Thus, any failure to give an accomplice instruction was harmless. (See *People v. Houston*, *supra*, 54 Cal.4th at p. 1225 ["[e]ven if we were to agree that substantial evidence showed [a third party witness] actually was an accomplice and that the trial court erred by failing to properly instruct the jury, the error was harmless under any applicable standard because the corroborating evidence of defendant's guilt . . . was overwhelming"].)

C.  *Any Improper Impeachment of Reddix's Alibi Witnesses Was Not Preserved for Appeal and Was Harmless*

Reddix argues the prosecutor improperly impeached the testimony of Reddix's three alibi witnesses, Acklin, Enoex, and Hodges, "with their failure to come forward earlier," and improperly called them "'11th hour' witnesses during his closing." Reddix argues that the trial court erred by allowing this impeachment without first conducting an inquiry into the foundational requirements of *People v. Ratliff* (1987) 189 Cal.App.3d 696. We conclude that Reddix forfeited his argument on appeal by not objecting at trial and that any possible error was harmless.

In *People v. Ratliff*, *supra*, 189 Cal.App.3d 696, the court held that "the prosecutor's cross-examination of the alibi witnesses, concerning their failure to volunteer their exculpatory information to the police prior to trial," was proper because "it was designed to test [the witnesses'] credibility, knowledge and recollection." (*Id.* at p. 700.) The court explained: "There is nothing inherently improper about cross-examining a defense witness as to his failure to come forward at an earlier date. In fact, the information discovered during this type of questioning may well aid the trier of fact in

13

its effort to determine whether the testimony is an accurate reflection of the truth or a recent fabrication. [¶] Although a citizen ordinarily has no legal obligation to offer exculpatory information to law enforcement officials, there are many situations where the natural response of a person would be to come forward in order to avoid a mistaken prosecution of a relative or friend. In that situation a witness's silence may be akin to a 'prior inconsistent statement,' and therefore, has probative value. [Citation.]" (*Id.* at p. 701.)

The *Ratliff* court went on to observe, however, that "there are situations where it would not be natural for a witness to offer exculpatory evidence to law enforcement officials, i.e., where they believe any disclosure would be futile; where they have been told by the defendant's attorney not to discuss the case; or where they are not aware they possess exculpatory information. Under these circumstances, the witness's failure to speak is consistent with his trial testimony." (*People v. Ratliff*, *supra*, 189 Cal.App.3d at p. 701.) The court stated that therefore "to ensure that a witness's pretrial silence was not a natural consequence the prosecution must lay a foundation for its relevance 'by first establishing that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, that the witness had reason to make the information available, that he was familiar with the means of reporting it to the proper authorities, and that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so.' [Citations.]" (*Ibid.*) The Supreme Court has referred to this additional discussion in the *Ratliff* opinion regarding requiring the prosecution to lay a foundation before asking the witness about his or her failure to come forward as "dictum." (*People v. Price* (1991) 1 Cal.4th 324, 430.)

In *People v. Tauber* (1996) 49 Cal.App.4th 518, the Court of Appeal went further and suggested that this part of the *Ratliff* opinion was inconsistent with "California's strong constitutional policy requiring the admission of relevant evidence" in a criminal

14

proceeding. (*Id* at p. 525; see Cal. Const., art. I, § 28, subd. (f), par. (2).)**8** The *Tauber* court agreed that "the fact a witness is aware of the potentially exculpatory nature of facts but fails to reveal that evidence to the authorities before trial is relevant to the witness's credibility. While there may be no legal obligation to come forward, it is so natural to do so that the failure to promptly present that evidence makes suspect its later presentation at trial." (*Tauber*, *supra*, at pp. 524-525, fn. omitted.) The *Tauber* court disagreed, however, that "the admission of such impeaching evidence [is] dependent on the satisfaction of the foundational criteria cited in the [*Ratliff*] opinion," and found "the *Ratliff* foundational criteria too restrictive." (*Id.* at p. 525.)

Reddix, however, has forfeited this issue because his counsel did not object to the impeachment questions at trial. In fact, the only objection at trial was not by counsel for Reddix but by the prosecutor, who argued that counsel for Reddix had violated her discovery obligations by not disclosing the three alibi witnesses before trial.**9** Reddix relies on a statement by his trial counsel that she was making a *Griffin* objection to the form of one of the questions to Acklin.**10** This objection, however, was to the

---

**8**     The *Tauber* court cited to former article 1, section 28, subdivision (d), of the California Constitution, now article 1, section 28, subdivision (f), paragraph (2), which provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. . . ."

**9**     The prosecutor objected that he did not receive information about the alibi witnesses "30 days before trial. I should be completely outraged at the discovery violation that's occurred here."

**10**     "'In *Griffin* [*v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], the United States Supreme Court held that the privilege against self-incrimination of the Fifth Amendment prohibits any comment on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom, whether in the form of an instruction by the court or a remark by the prosecution.' [Citation.] In *People v. Hughes* (2002) 27 Cal.4th 287 . . . , the California Supreme Court explained that 'it is [*Griffin*] *error* for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that

15

prosecutor's question asking Acklin if he told the defense that he was "an alibi witness in the case," which Acklin answered by stating, "Yeah." The objection under *Griffin* appears to have been that whether Acklin told Reddix that he (Acklin) was an alibi witness could only be disproved by Reddix. This objection was not specific enough to preserve an improper impeachment objection under *Ratliff*. (See *People v. Price*, *supra*, 1 Cal.4th at p. 430 [defendant could not challenge on appeal admission of *Ratliff* alibi impeachment where "defense counsel did not object at trial on the specific ground urged on appeal"].)

In any event, any error was harmless. Acklin, Enoex, and Hodges were all able on redirect examination to explain their actions and why they had not spoken with the prosecutor or the police.[11] The jury was able to evaluate this testimony and the credibility of the three witnesses. Moreover, there was more than enough other evidence, including the alibi witnesses' personal and familial relationship with Reddix and their prior felony convictions, to impeach their testimony and show their biases. As the trial court recognized, in response to the prosecutor's objection that counsel for Reddix had committed a discovery violation by not disclosing the three alibi witnesses before trial, "The reality is you [the prosecutor] haven't been prejudiced. You've got three felony

---

evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf. [Citations.] . . . [I]t is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide.' [Citation.] [¶] *Griffin* error may be committed by either direct or indirect comments on the defendant's failure to testify in his defense. [Citations.]" (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1273.)

[11]     Acklin said he did not know he "was supposed to speak with" the prosecutor and thought he "was only supposed to speak with the defense attorney." Enoex and Hodges stated that the district attorney never contacted either of them, even though they were in court.

convictions on the guy [Acklin]. You have a very solid victim," Green, and a "very believable" witness, Hines. Reddix did not suffer any prejudice either.[12]

## DISPOSITION

The judgment is affirmed.

SEGAL, J.[*]

We concur:

WOODS, Acting P. J.

ZELON, J.

---

[12] The prosecutor's comment that Reddix's alibi witnesses were "'11th hour' witnesses" was not misconduct. The statement, based on proper impeachment testimony, was well within the "'wide latitude'" prosecutors have "'to draw inferences from the evidence presented at trial'" during closing argument. (*People v. Tully* (2012) 54 Cal.4th 952, 1022; see *People v. Jones* (2013) 57 Cal.4th 899, 976.)

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.